IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ASBESTOS LITIGATION

| | | |
|---|---|---|
| LILLIAN and JAMES HARWOOD, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 1-06-CV-673 |
| | ) | |
| vs. | ) | |
| | ) | |
| BONDEX INTERNATIONAL, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF MOTION TO REMAND TO STATE COURT**

**BIFFERATO, GENTILOTTI,
BIDEN & BALICK, L.L.C.**

_____
Ian Connor Bifferato (DE Id. No. 3273)
Garvan F. McDaniel (DE Id. No. 4167)
1308 Delaware Ave.
P.O. Box 2165
Wilmington, DE 19899-2165
(302) 429-1900
Fax: (302) 429-8600

Date: December 4, 2006

**TABLE OF CONTENTS**

AUTHOTITIES CITED……………………………………..……………………….……iii

INTRODUCTION………………………………...……………….…………….… …..…….1

STATEMENT OF THE CASE……………………………………………….….…………..1

     *Newport News Shipyard*………………………………………………………1

     *Ingalls Shipyard*………………………………………………………..……2

     *Affidavits Filed By Northrop*…………………….………………………...…3

     *Nuclear-powered Submarines*………………………………………………4

     *Heavy Cruisers and Aircraft Carriers*……………………….… ……………6

     *LHAs (at Ingalls)*……………………………………………………….7

     *Milspecs and Indexes*……………………………………………………7

     *Work Practice, Health and Safety Provisions*……………………………8

ARGUMENT…………………………………..……….………………..…………..…..9

     (A) Northrop Cannot Amend
          Its Deficient Notice Of Removal……………………….……………10

     (B) Even With Its New Materials, Northrop
          Has Fail To Show That Removal Here Was Proper……………………11

        (1) *The Removing Party Bears the Burden of Proof*…………………12

        (2) *Northrop has Failed to Establish Each Element for Removal*………13

           (a) *Acting Under an Officer or Agency*……………………….…13

           (b) *Colorable Federal Defense*……………………………17

(c) *Causal Nexus* ............................................................18

(C) Northrop's Notice Was Untimely .............................................19

CONCLUSION ..........................................................................20

## AUTHORITIES CITED

*Akin v. Big Three Industries, Inc.,*
      851 F Supp. 819 (E.D. Tex. 1994)..................................................20

*Bakalis v. Crossland Sav. Bank,*
      781 F.Supp. 140 (E.D. N.Y. 1991) ..............................................14

*Blackman v. Asbestos Defendants (BHC),*
      1997 WL 703773 (N.D. Cal. November 3, 1997) ...........................15

*Carter v. ASandS, Inc.,*
      2002 WL 31682352 (E.D. Tex. 2002) ..........................................16

*Cohn v. Petsmart, Inc.,*
      281 F.3d 837 (9th Cir. 2002) .....................................................11

*Crocker v. Borden, Inc.,*
      852 F Supp. 1332 (E.D. La. 1994) ...............................................16

*Durham v. Lockheed Martin Corp.,*
      445 F.3d 1247 (9th Cir. 2006) ...................................................12

*Fields v. Jay Henges Enterprises, Inc.,*
      2006 WL 1875457 (S.D. Ill. June 30, 2006) ................................19

*Freiberg v. Swinerton & Walberg Property Svcs.,*
      245 F.Supp.2d 1144 (D. Colo. 2002) ..........................................12

*Fung v. Abex Corp.,*
      816 F.Supp. 569 (N.D. Cal. 1992) ..............................................14

*Good v. Armstrong World Industries, Inc.,*
      914 F.Supp. 1125 (E.D. Pa. 1996) ..............................................15

*Int'l Ins. Co. v. Saco Defense, Inc.,*
      1998 WL939680 (N.D. Ill. January 8, 1998) ...........................13, 19

*Lefall v. Dallas Independent Sch. Dist.,*
      28 F.3d 521 (5th Dist. 1994) ......................................................20

*Madden v. Able Supply Co.,*
      205 F.Supp.2d 695 (S.D. Tex. 2002) .......................................18, 19

*McGlasson v. Barger,*
      220 F.Supp. 938 (D. Colo. 1963) ................................................10

*Mesa v. California*,
    489 U.S. 121, 109 S.Ct. 959 (1989)..................................................13

*Miller v. Principal Life Ins. Co.*,
    189 F.Supp.2d 254 (E.D. Pa. 2002)..............................................11

*Mitchell v. AC&S Inc.*,
    2004 WL 3831228 (E.D. Va. December 15, 2004) ........................13, 17

*Niemann v. McDonnell Douglas Corp.*,
    721 F.Supp. 1019 (S.D. Ill. 1989)..................................................17

*Oliver v. Oshkosh Truck Corp.*,
    96 F.3d 992 (7th Cir. 1996)..........................................................18

*Pack v. ACandS, Inc.*,
    838 F.Supp. 1099 (D. Md. 1993)....................................................16

*Ryan v. Dow Chemical Co.*,
    781 F.Supp. 934 (E.D. N.Y. 1992)................................................14

*Steel Valley Authority v. Union Switch & Signal Div.*,
    809 F.2d 1006 (3rd Cir. 1987)......................................................12

*Sun Buick, Inc. v. Saab Cars USA, Inc.*,
    26 F.3d 1259 (3rd Cir. 1994)........................................................12

*USX Corp. v. Adriatic Ins. Co.*,
    345 F.3d 190 (3rd Cir. 2003).........................................................11

*Williams v. General Electric Co.*,
    418 F.Supp.2d 610 (M.D. Pa. 2005)..........................................10, 11, 12

*Willingham v. Morgan*,
    395 U.S. 402, 89 S.Ct. 1813 (1969)...........................................10, 11

## INTRODUCTION

In response to plaintiffs' *Motion to Remand*, defendant Northrop Grumman Corporation ("Northrop") has filed a mass of paperwork purporting to show that the United States Navy specified the asbestos-containing materials to which James Harwood—and through him, Lillian Harwood—were exposed. These various exhibits and affidavits fall short of that mark. Upon close examination, Northrop has failed to point to any express or implicit requirement that it use asbestos in a particular application, much less one connected to Mr. or Ms. Harwood. Even if Northrop had shown that it was required to *use* asbestos-containing materials, that alone would not be enough to carry its burden to justify removal. Merely including such components on Navy vessels, by itself, did not expose Ms. Harwood. Rather, Northrop's work practices and its failure to warn are essential links in the causal chain.

Basically, there is no evidence that the Navy prohibited Northrop from using practices, taking precautions, or issuing warnings with respect to the use of asbestos, which would have prevented or reduced Ms. Harwood's exposure. Indeed, the very evidence provided by Northrop is to the contrary.

## STATEMENT OF THE CASE

As explained in plaintiffs' *Motion to Remand* and *Memorandum in Support*, this is a primarily a 'take-home' case. Lillian Harwood, who suffers from asbestos-related mesothelioma, was exposed to asbestos carried home by her husband, James Harwood, from his employment at the Newport News and Ingalls shipyards, which were owned and operated by Northrop predecessors.

*Newport News Shipyard*

1

Mr. Harwood worked at Newport News from 1949 to 1970, primarily as a design specialist. His presence onboard Navy ships during actual construction was limited. Most of his known involvement with asbestos at Newport News had no connection to the Navy or any government contract. Mr. Harwood "[knew] full well" that he was working around insulation that contained asbestos on a tugboat during his apprenticeship. *J. Harwood Depo.*, p. 38. There is no evidence that this vessel was a Navy tugboat. Mr. Harwood also testified that he was exposed to asbestos in the various buildings at Newport News. *Id.* at pp. 43-44, 96. There is no evidence that the building, shops and other structures comprising the shipyard were built or maintained according to government specifications.

Because most of Mr. Harwood's duties at Newport News involved design, he was only infrequently aboard vessels during construction. He recalls an eight-month period near the end of his time there, during which he was working in noise reduction and had occasion to go on board some aircraft carriers and submarines, none of which were specifically identified. *Id.* at pp. 44-45. He worked as a machinist on the heavy cruiser, *Newport News*, during an apprenticeship rotation in 1949-50. *See J. Harwood depo.*, pp. 26-29, 40. He "worked in some aspect of the design for" the *John F. Kennedy* and the *Nimitz* (a nuclear-powered carrier), but did not state that he was onboard either one while work was being performed. *J. Harwood Depo.*, at p. 60. In fact, he testified that he was only in the engine compartment of the *JFK* after it was operational, and was never in the engine compartment of the *Nimitz*. *Id.* at p. 116-17. Mr. Harwood worked on designing the 601 class submarines and "rode out on the first sea trial," but was in their engine compartment only after they were operational. *J. Harwood Depo.*, pp. 60-61, 116-17.

*Ingalls Shipyard*

2

Mr. Harwood transferred to Ingalls in 1970 and worked there until his retirement. Because he was a field engineer at Ingalls, Mr. Harwood had more regular contact with construction activities there, than at Newport News. Northrop did not build carriers or nuclear submarines at Ingalls. The types of vessels, on which Mr. Harwood worked there, were LHAs and LDAs. As a procedural note, Northrop's *Notice of Removal* does not assert that any of its activities at Ingalls were under the direction and control of the Navy.

### Affidavits Filed By Northrop

Northrop has provided affidavits from two employees—Ronald Ward and Bernard Clark—in opposition to plaintiffs' *Motion to Remand*. Both employees have little or no personal knowledge of events at Newport News, during the time Mr. Harwood was there. According to their affidavits, neither one ever set foot in Ingalls. Mr. Ward began as shipfitter at Newport News in 1961. *See Ward Aff.*, Def. Exhibit D-1, ¶ 2. He held an engineering position for about three years between 1965 and 1970. *Id.* (states that was off two years for school). He did not become involved and familiar with the alleged extent of Navy supervision and control, until he went to the Cost Engineering department in 1969, just one year before Mr. Harwood transferred to Ingalls. *Id.* at ¶3.

Mr. Clark began at Newport News in 2002. *See Clark Aff.*, Def. Exhibit E, ¶ 2. He served in the Navy beginning in 1964, but was involved in shipbuilding only from 1983 to 1997. *Id.* He was at the Charleston Naval Shipyard from 1983 to 1993, and was a deputy supervisor with SUPSHIPS in New Orleans from 1993 to 1997. *Id.* Mr. Clark's entire affidavit rests on his assertion that he became familiar with "general procedures" and that those procedures "have remained largely unchanged." *Id.* at ¶3. His affidavit is

general and non-specific as to Newport News, Ingalls, the Harwoods and any exposure Ms. Harwood had to asbestos.

Whereas these affidavits are general, Mr. Harwood gave testimony concerning the extent of government supervision over his work in particular. As to contact with federal employees, he stated that conversations involved "[c]larification between what they were interpreting preliminary design criteria verses what *we were later deciding* how we were going to build something." *J. Harwood Depo.*, at p. 66 (*emphasis added*). Mr. Harwood also testified that there was no "military oversight of the day-to-day construction of [vessels]" on which he worked. *Id.* at p. 68. Mr. Harwood also testified as follows:

> Q.    In the design work of a military vessel, can you describe for us the interplay or the relationship you would have with anyone from the military?
>
> A.    You don't really have very much contact with them. In fact, it was very rare. Once the contract is given and we start to make working drawings, they're called, you almost never see anybody from SUPSHIPS or the Navy.

*J. Harwood Depo.*, p. 75.

Mr. Harwood's testimony concerning the extent of government oversight is not just more particular to his work, but also more consistent with the actual language of the documents produced by Northrop.

*Nuclear-powered Submarines*

Northrop, primarily through Mr. Ward and exhibits attached to his affidavit, devotes a great deal of attention to nuclear submarines at Newport News. Paragraph 10 of Mr. Ward's affidavit significantly mischaracterizes provisions from the attached contract (*Def. Ex. D-2, Ex. A to Ward Aff.*) and attempts to overstate their general applicability. That contract, at page 2, does not expressly "require NNS [Northrop] to comply with

4

'contract terms, contract plans and specifications…subject to review and approval by the Government." Northrop simply "recognizes that the existence of the Navy Inspection organization at its plant does not relieve it of the responsibility for proper inspection to insure that the ship is complete and in every respect complies with the contract terms, contract plans, and specifications." If anything, this provisions establishes that the Navy did not maintain sole responsibility for, and control over, inspecting the work.

Mr. Ward avers in ¶ 10 that "[t]he work performed on numerous ship systems was pursuant to work plans, technical manuals and other design data produced by the Navy, which were required to 'be used without deviation, unless deviations are authorized by the Bureau of Ships." (*citing* pp. 2-3 of *Def. Ex. D-2, Ex. A-1 to Ward Aff.*). What that document actually says is that the "design data for the reactor plant and propulsion control systems…shall be used without deviation…." *See* ¶ (b)(i)c, at p. 3. Basically, Northrop was only required to follow the plans relating to *nuclear reactors and their controls* without deviation. Northrop has not cited any similar requirement in any other contract or with respect to 'ship systems' generally (as suggested by the affidavit). It has not provided any evidence that asbestos-containing materials were used on or in connection with the reactors on nuclear submarines. There is no evidence that Mr. Harwood was ever in the vicinity of a reactor, while any work was being performed.

Other provisions of the submarine contract, which Northrop fails to highlight, demonstrate that government control was not particularly exacting as to other systems. In discussing design data, that contract provides in part (b)(ii) at p. 4 that "[n]othing in this paragraph (b)(ii) is intended to limit, nor shall it be construed as limiting *the Contractor or the Government* in its selection of components, equipment, and other material for the

vessels to be constructed under this contract." (*emphasis added*).This appears to give

Northrop some discretion to select components and materials outside the reactor.

*Heavy Cruisers and Aircraft Carriers*

Exhibit D1 to Mr. Ward's affidavit (*Def. Ex. D-6*) is a contract for the

construction of heavy cruisers. Mr. Harwood's work on the cruiser *Newport News* was in

1949-50—before Mr. Ward was at the shipyard. *See J. Harwood depo.*, pp. 26-29, 40.

Although Mr. Ward suggests that the contract relates to the cruiser *Newport News*, it is

dated 1944 with completion dates in 1947. That would be two years before Mr. Harwood

came to the shipyard, casting doubt on that implication. More important, Northrop does

not identify any portion of this contract specifically relevant to the issues at hand,

including any provision expressly requiring the use of asbestos or specifically or

requiring that government specifications had to be followed 'without deviation.' Exhibit

D2 to Mr. Ward's affidavit (*Def. Ex. D-7*), purports to be a contract for construction of

the *JFK*. As noted, Mr. Harwood was in the engine compartment of this vessel only after

it was operational, rather than while work was being performed.

To the extent that this contract is offered as a general example of government

control over shipbuilding, article 3, p.3 provides that government does not guarantee "the

correctness and accuracy of any details, dimensions, or any other information appearing

therein, nor does the Government guarantee that such plans and other data include all

data necessary for the construction of the vessel under this contract." *See Def. Ex. D-7*. It

is difficult to imagine that anyone could be required to strictly comply with incomplete or

inaccurate specifications. Additionally, this same provision states, "[n]othing in this

paragraph (a) is intended to limit, nor shall it be construed as limiting, the Contractor or

the Government in the selection of components, equipment, and other materials for the vessel to be constructed under this contract." *Id.* Again, when it came to the down-the-line details, Northrop and the government were on equal footing.

### LHAs (at Ingalls)

The LHA contract provided by Northrop (*Def. Exs. G-1 & G-2*) affirmatively demonstrate a lack of strict government control over this project. The LHA project involved a "performance type Contract" which expressly provided for "the Government's substantial dissociation from controls over the work." *Def. Ex. G-2*, Article XIX, ¶ (e), p. 32. Article II, ¶ (b), at p. 5, references specifications being "revised by the Contractor." Paragraph (c), at p. 5, provides that the Navy's general specifications "shall, to the extent *not inconsistent with the Contractor's methods and procedures* for vessel production... constitute the intent of the parties with respect to the design and production of the vessels." (*emphasis added*). Article V, ¶ (a), at p. 9, requires Northrop to "correct any design and engineering deficiencies." Basically, Northrop—not the Navy—made the final call on design. Article XXX, p.48 indicates that the contractor was at least an equal participant in developing the plans and specifications, and that it "assumes full responsibility for delivering LHA ships that meet or exceed [those] performance requirements..." 'Strict compliance without deviation' would preclude delivering a vessel that exceeded performance requirement because 'better' is necessarily 'different.'

### Milspecs and Indexes

The only documents provided by Northrop, which actually mention asbestos, are various "Milspecs" and similar specifications, standards or indexes. *See Def. Ex. D-4* (*Ex B to Ward Aff.*)(Military Standards for Thermal Insulation for Machinery and Piping;);

*Def. Ex. D-5* (*Ex. C to Ward Aff.*)(military specifications); *Def. Exs. F-1 – F-14* (indexes of Navy specifications). None of the items on any of these 'lists' is specifically connected to any particular vessel, system, project or contract. Exhibit D-4 includes non-asbestos as well as asbestos insulation materials, and provides no information or criteria for choosing one type over another. Exhibits F-1 through F-14 also list items such as apricots, apples, asparagus, volley balls, various bags and bandages among many, many other things. Presumably, the mere listing of an item on such an index is not proof that it was a required component for Naval vessels—unless the Navy required Northrop to build vessels out of fruit. Many of these documents pre-date Mr. Harwood's work for Northrop and are stamped "superseded" without any indication as to when that occurred.

## Work Practice, Health and Safety Provisions

It is undisputed that the federal government had no day-to-day influence or input as to work practices at Newport News or Ingalls. Mr. Harwood testified that, as far as he knows, the Navy never issued "any standard operating procedures or policies" for Newport News employees. *J. Harwood Depo.*, at p. 77. He was not aware that "the Navy had a hand in either the design or the enforcement of safety protocols at Newport News[.]" *Id.* Likewise, Mr. Harwood was not "aware of any impact or influence the federal government would have had in the Ingalls employee personnel handbook or policy book[.]" *Id.* at p. 83. This is consistent with the contracts themselves which, if anything, require compliance with health and safety regulations.

For example, one of the contracts provided by Northrop requires compliance with the Walsh-Healey Public Contracts Act. *See Def. Ex. D-9* (*Ex. D4 to Ward affidavit*), Article 44, p. 25-26. Regulations under that act not only address certain health

8

precautions, but specifically require showers and changing rooms—a critical practice for preventing take-home exposure. Indeed, it would appear that the government *wanted* Northrop to tell Mr. Harwood to shower and change clothes before leaving work. Provisions from the documents show that, even if the government specified asbestos (which Northrop has not proved), it expected Northrop to utilize proper work practices.

Article 9 of the submarine contract provides, "[t]he Contractor shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property, and shall comply with all health, safety, and fire protection regulations and requirements..." *Def Ex. D-2*, p. 12. Article 11 of the contract identified as relating to the *JFK* expressly requires compliance with health and safety regulations. *See Def Ex. D-7*. Article XX of the LHA contract provides that "[a]ll such above personnel [anyone having access to the vessels] shall be required to comply with all Contractor rules and regulations governing personnel at its shipyard including those relating to security and safety." *Def Ex. G-2*, at p. 32.

<u>ARGUMENT</u>

Northrop asserts that this Court should defer ruling on plaintiffs' *Motion to Remand*, but does not identify any reason or supporting authority. Northrop asserts that this Court has discretion to allow it to amend its deficient *Notice of Removal*; however, it does not move for such amendment or state reasons why allowing it to amend would be proper here. Nothing in the affidavits or exhibits provided by Northrop specifically connects Ms. Harwood's exposure and illness to any government-mandated use of asbestos at either shipyard. Northrop fails to cite even one specific provision in the mass

9

of paperwork it has provided that says, in effect, 'use asbestos here.' Instead, it relies entirely upon generalities. Moreover, the documents provided by Northrop clearly show that: (1) the Navy had no control over shipyard work practices; (2) the Navy never prevented Northrop from taking appropriate precautions to protect its employees and their families from exposure to asbestos; and (3) there was no conflict between Northrop's contractual obligations to the federal government and its state-law duties to Ms. Harwood because the contracts required it to follow health and safety regulations.

(A)
### Northrop Cannot Amend Its Deficient Notice Of Removal

Northrop's *Notice of Removal* is facially deficient because it fails to set forth specific acts and omissions, mandated by the Navy, that caused Ms. Harwood's exposure to asbestos. Northrop does not expressly dispute that its *Notice* is deficient in this regard. Rather, it argues that it should be allowed to amend or supplement that *Notice* now. It implies that its ability to do so should be automatic and limitless. The law does not afford such latitude. The removing defendant may provide evidentiary support for specific and sufficient allegations already contained in its notice of removal. It may assert a new theory, based upon facts already alleged. It may not salvage a deficient notice of removal by providing the requisite specifics for the first time in response to a motion to remand.

Northrop asserts that *McGlasson v. Barger*, 220 F.Supp. 938 (D. Colo. 1963) is inapplicable because it was decided prior to 1988, when the statute was amended. Northrop does not set out this amendment nor explain how it impacts a defendant's ability to amend a deficient notice. Interestingly, Northrop cites *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813 (1969)—which was also decided prior to 1988—in support of its position. In *Willingham*, the Supreme Court did not actually *decide* that an

amendment should be allowed, but simply mentioned that it would "treat the removal petition as if it been amended." 395 U.S. at 408, n. 3. The Court expressly noted, "[t]his material should have appeared in the petition for removal." *Id.*

None of the other cases cited by Northrop supports its assertion that it can interject necessary factual details at this stage of the proceedings. In *USX Corp. v Adriatic Ins. Co*, 345 F.3d 190 (3rd Cir. 2003), the removing defendant was permitted to assert a slightly different theory based upon the same facts and statute set out in its notice. As a matter of fairness, that defendant's original theory had been rendered unavailable by an intervening Supreme Court decision. In *Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2002), the defendant had made the required allegation in its notice, that the amount in controversy exceeded $75,000. Thus, providing information that pinpointed that amount did not inject entirely new material. Here, Northrop's *Notice of Removal* did not even generally assert how the government compelled it to expose Ms. Harwood to asbestos. In *Miller v. Principal Life Ins. Co.*, 189 F.Supp.2d 254 (E.D. Pa. 2002), the amendment in question went only to curing a technical procedural defect by asserting that a co-defendant was a nominal party. In the case at bar, Northrop is trying to add necessary jurisdictional allegations omitted from its defective *Notice*. Even if a court has some discretion to allow amendment, Northrop has offered no reason why it should be permitted to do so here.

(B)
Even With Its New Materials,
<u>Northrop Has Fail To Show That Removal Here Was Proper</u>

The issue of whether or not Northrop can amend its Notice is somewhat academic because, even with the additional materials, it has failed to carry its burden to show that

11

removal was proper. The most critical (but not the only) defect is Northrop's failure to offer any proof that the Navy precluded Northrop from taking precautions with respect to Northrop's own employees and their families, or that the Navy exercised any control over work practices at Newport News and Ingalls.

(1)

*The Removing Party Bears the Burden of Proof*

Northrop argues that the federal officer statute should be broadly construed in favor of removal. It cites *Willingham*, 395 U.S. 402, which involved federal prison officials, not outside contractors. Although the statute is broadly applied in favor of such actual government officials, contractors such as Northrop "bear a special burden in establishing the official nature of their activities." *Williams v. General Electric Co.*, 418 F.Supp.2d 610, 614 (M.D. Pa. 2005)(q*uoting Freiberg v. Swinerton & Walberg Property Svcs.*, 245 F.Supp.2d 1144, 1150 (D. Colo. 2002)(*emphasis in original*)

*Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir. 2006) is of no help to Northrop because the only issue on appeal was whether sanctions for improvident removal had been properly imposed. Northrop inaccurately suggests that the Third Circuit has held that § 1442(a)(1) must be broadly construed, even in favor of government contractors. Yet, neither of the Third Circuit cases cited at pages 16-17 of its brief even mentions federal officer removal. *See Steel Valley Authority v. Union Switch & Signal Div*, 809 F.2d 1006 (3rd Cir. 1987)(holding that diversity jurisdiction removal is strictly construed, but not mentioning 1442(a)(1)); *Sun Buick, Inc. v. Saab Cars USA, Inc*, 26 F.3d 1259 (3rd Cir. 1994)(remanding case because state board proceeding was not a court case subject to removal).

12

Even if removal under § 1442(a)(1) is somewhat more deferential, this does not shift the burden to plaintiffs to prove that removal was improper. The removing party *always* bears the burden to justify removal, even under § 1442(a)(1). Indeed, several cases cited by Northrop reaffirm this rule. *See e.g. Int'l Ins. Co. v. Saco Defense, Inc.*, 1998 WL939680 (N.D. Ill. January 8, 1998); *Mitchell v. AC&S Inc.*, 2004 WL 3831228 (E.D. Va. December 15, 2004)("burden of establishing removal jurisdiction rests with the party seeking removal…[a]ny doubts…are to be resolved in favor or remand").

(2)
*Northrop has Failed to Establish Each Element for Removal*

Northrop asserts that it can satisfy each element for federal officer removal. These four elements are: (1) that it is a person within the meaning of the statute; (2) that it was acting under the direction of a federal officer or agency when it committed the acts and omissions in question; (3) that it has a colorable federal defense; and (4) that there is a causal nexus between plaintiff's injury and acts or omissions mandated by the federal government. *See Mesa v. California*, 489 U.S. 121, 124-25, 109 S.Ct. 959 (1989). Plaintiffs do not dispute that Northrop is a "person" within the meaning of the removal statute. Plaintiffs rely primarily upon Northrop's failure to establish a complete, specific causal link between any government mandate and Ms. Harwood's exposure to asbestos. Northrop pays very little attention to this critical issue.

(a)
*Acting Under an Officer or Agency*

Plaintiffs do not contend that Northrop has failed to identify the officer or agency, under which it allegedly acted. That would be the Navy. Northrop's deficiency as to this element lies in its failure to demonstrate that the Navy required it to use specific asbestos-

13

containing components, much less that the Navy controlled work practices at Northrop's
shipyards. At most, Northrop can show that it acted under the general supervision of the
Navy in building vessels, which is not enough.

Contrary to Northrop's characterization, *Fung v. Abex Corp.*, 816 F.Supp. 569
(N.D. Cal. 1992) did not involve a fact situation similar to the one presented here. That
case involved military personnel who were exposed to asbestos during active duty. The
only claims at issue were product claims, not premises. Here, Ms. Harwood was never in
the military (nor was her husband), and her exposure did not result just from the inclusion
of asbestos components in equipment she used. Northrop's work practices at the
shipyards are a necessary link in the causal chain leading to her exposure.

The court in *Fung*, also cited with approval to the rule relied upon by plaintiffs,
that "[i]f the corporation establishes 'only that the relevant acts occurred under the
general auspices of a federal officer…they are not entitled to § 1442(a)(1) removal.'" 816
F.Supp. at 572 (*citing Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947 (E.D. N.Y.
1992); *Bakalis v. Crossland Sav. Bank*, 781 F.Supp. 140, 144-45 (E.D. N.Y. 1991). The
court expressly notes that a "majority of courts have held that the federal official must
have 'direct and detailed control' over the defendant." *Id.* The issue, which Northrop
ignores, is whether Northrop has shown that the *specific* acts and omissions at issue were
undertaken pursuant to *specific* government directives. Here, Northrop has established
only that it was acting under the general auspices or direction of the Navy, and has failed
to establish the requisite "direct and detailed control" over the specific relevant acts and
omissions.

14

The only contract provided by Northrop, which required it to adhere to specifications "without deviation" applied only to the reactors used on nuclear submarines. There is no evidence that asbestos was used on those reactors or that Mr. Harwood was around a reactor while work was in progress. In general, Northrop's evidence does not place asbestos and Mr. Harwood together aboard any Navy ship at Newport News. It certainly does not put him in the vicinity of any government-mandated use of asbestos. At Ingalls, where Mr. Harwood was more directly involved in building LHAs, the contract expressly disavows detailed government control over the project.

In *Blackman v. Asbestos Defendants (BHC)*, 1997 WL 703773 (N.D. Cal. November 3, 1997), another case cited by Northrop, the removing defendant identified specific drawing numbers that expressly specified asbestos-containing components in the device to which plaintiff had been exposed. *See supra* at *1. Here, Northrop has not proving anything close to that level of specificity. Instead, it relies upon layers of general contracts and generic lists of commodities, but cannot point to one document that actually calls for asbestos on any vessel. Like every case cited by Northrop, *Blackman* involved only product claims, not premises liability.

Norhtrop cites to four cases, which it claims reject the "strict literal approach" set forth in *Good v. Armstrong World Industries, Inc.*, 914 F.Supp. 1125 (E.D. Pa. 1996). In all four cases, Westinghouse (or its current successor-in-interest) successfully removed cases alleging exposure to asbestos components in marine turbines supplied to the Navy. All four were involved only product claims and, unlike the case at bar, did not involve allegations of premises liability against the removing defendant. Moreover, unlike

15

Northrop, Westinghouse provided evidence that the Navy had specifically required it to use asbestos components in the turbines in question.

*Carter v. ASandS, Inc.*, 2002 WL 31682352 (E.D. Tex. 2002) involved exposure that occurred while plaintiff's decedent was on active duty in the Navy. The court observed that "the U.S. Navy had ultimate control over warnings affixed to equipment on naval vessels, as well as written materials accompanying Westinghouse turbines used on board naval vessels." *supra* at *4. Here, even if Northrop had shown that the Navy required asbestos, there is no evidence that it prohibited Northrop from warning Northrop's own employees or instructing them in safer methods for using asbestos.

Two of these cases were decided prior to *Good*—so, it is difficult to understand how they could expressly reject its holding. *See Crocker v. Borden, Inc.*, 852 F.Supp. 1332 (E.D. La. 1994); *Pack v. ACandS, Inc.*, 838 F.Supp. 1099 (D. Md. 1993). Neither *Crocker* nor *Pack* expressly discusses the causal nexus requirement in detail. In *Mitchell*, the court noted that the "plaintiff has not claimed that the defendant failed to meet the third requirement for section 1442(a)(1) removal [i.e. causal nexus]." *supra* at *5. That is *precisely* what plaintiffs here assert—that Northrop has failed to establish a link between any specific government requirement and Ms. Harwood's exposure.

The court in *Mitchell* did not so much reject a 'strict literal approach' as it distinguished *Good*. In this regard, the court stated:

> Unlike the defendant in *Good*, the defendant in the instant case does not claim in its Notice of Removal that it acted under the direction of the Secretary of the Navy. Rather the defendant avers that it operated under the control of officers of the United States Navy...Unlike the situation presented in *Good*, then, the Gate affidavit supports the defendant's position in its Notice of Removal that it acted under control of officers of the Navy.

*Mitchell* at *3.

According to the court, the difference between *Mitchell* and *Good* was not about a strict verses a lenient approach, but about the relative sufficiency of each notice of removal. The defendant in *Mitchell* simply filed an initial notice that contained proper allegations, whereas the defendant in *Good* had not. Clearly, therefore, *Mitchell* supports plaintiffs' position that the allegations set forth in the *Notice of Removal* define the basis upon which remand is to be determined.

*(b)*
*Colorable Federal Defense*

Northrop asserts, without real factual support, that it followed precise government specifications. Nothing provided by Northrop shows that it was required to use asbestos in any particular application, much less a relevant one. The indexes and other generic specifications provided by Northrop are insufficient because these simply list materials, but do not specify any particular use.

Northrop correctly asserts that the government contractor defense can apply to *some* failure to warn cases. It cannot, however, apply to this particular failure to warn case because Northrop could have warned the Harwood's without affixing a label to a military product. In *Niemann v. McDonnell Douglas Corp.*, 721 F.Supp. 1019 (S.D. Ill. 1989), the plaintiff's decedent had been a civilian aircraft mechanic at an Air Force base, where he had been exposed to asbestos from military aircraft manufactured by defendants. Because the defendant aircraft manufactures had no direct contact with the decedent, the only way to warn him would have been to put labels on the hazardous aircraft components or include such information with the aircraft. Mr. Harwood worked for Northrop and could have been warned directly, without regard to what labels or

17

information the Navy allowed to accompany its vessels.[1] *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992 (7th Cir. 1996) is distinguishable on the same basis. There, as in *Niemann*, the injuries in question were to the end-users of a finished piece of military equipment who had no other relationship to the removing defendant. Here, as repeatedly noted, Northrop had ways to warn Mr. Harwood of the hazards of take-home exposure without labeling finished military products or providing accompanying instructions.

### (c)
### *Causal Nexus*

The primary reason why this case must be remanded is the lack of a causal nexus between any obligation to the government and the specific acts and omissions that exposed Ms. Harwood to asbestos. Northrop's use of asbestos in Navy vessels, even if required by the government, provides only one link in that causal chain. Ms. Harwood's exposure was a direct result of Northrop's work practices and failure to warn its shipyard employees, neither of which was controlled by the Navy. All Northrop had to do was tell Mr. Harwood to shower and change before leaving work. There is not one iota of evidence that the Navy precluded it from doing so.

Northrop pays little attention to this element and does not address the arguments raised by plaintiffs in their *Memorandum in Support*. It makes no effort to even articulate a theory connecting the specific manner in which Ms. Harwood was exposed to any government mandate. The cases it cites are not in point. As discussed above, *Blackman*, *supra* involved only end-user exposure, and the removing defendants had no control over the work practices giving rise to exposure. Likewise, *Madden v. Able Supply Co.*, 205

---

[1] It is also clear that the court in *Niemann* was not really addressing a claim that the defendant had failed to warn the plaintiff, but the third prong of the *Boyle* test. Plaintiffs here do not contend that Northrop should have warned the Navy or that its failure to do so precludes removal.

F.Supp.2d 695 (S.D. Tex. 2002) involved end-user exposure of someone on active
military duty. Neither case addresses the issue presented here.

(C)<br>Northrop's Notice Was Untimely

Northrop contends that it had no obligation to investigate the facts alleged in the
initial complaint to determine if the case might be removed. This ignores the fact that Mr.
Harwood was its former employee. Thus, assessing removability would not have required
an outside investigation, but simply searching its own corporate memory. Northrop's
position in this regard is no different than a defendant asserting that it had no obligation
to 'investigate' its own State of incorporation or principal place of business.

In *Int'l Ins. Co.*, *supra*, a case cited by Northrop, the plaintiff admitted that the
case was not removable based upon the initial complaint. Moreover, that case was
decided on a very narrow issue not presented here—that the removing defendant was not
obligated to rely upon the accuracy of information as to a party's principle place of
business as set forth in a report from Dunn & Bradstreet. In fact, the removing defendant
served interrogatories five days after receiving the report, and removed the case two
weeks after receiving confirmation. Indeed, as another court held "federal removal
statutes do not favor 'a defendant who...sit[s] on his right to remove until such time as he
deems it provident to discover from the plaintiff the requisite jurisdictional facts and
remove the case to federal court.'" *Fields v. Jay Henges Enterprises, Inc.*, 2006 WL
1875457 (S.D. Ill. June 30, 2006) at *7 (*quoting Int'l Ins.* at *5).

*Durham* was decided on a similarly narrow and irrelevant basis. The only issue,
as articulated by the court, was "whether the thirty-day clock is reset if the defendant later
discovers the case is also removable on federal officer grounds." 445 F.3d at 1249. The

19

court relied primarily on the fact that, unlike federal officer removal, federal enclave removal would have required unanimous consent. Thus, the court concluded that a new time limit began to run, when the federal officer basis for removal became known.[2]

Northrop also cites to *Akin v. Big Three Industries, Inc.*, 851 F.Supp. 819 (E.D. Tex. 1994). The holding, that defendants' removal was timely, was based upon a rather tortured construction of the initial complaints, which unequivocally alleged that plaintiffs' exposures occurred at Tinker Air Force base. The court found this to be ambiguous and held that defendants were entitled to verify that every exposure really had occurred there. In *Lefall v. Dallas Independent Sch. Dist.*, 28 F.3d 521 (5th Dist. 1994), the original complaint did not assert a federal claim. The defendant filed for removal within thirty days of an amendment adding a section 1983 cause or action.

## CONCLUSION

Plaintiffs respectfully submit that this case should be remanded to Delaware State Court for the reasons set forth herein and in plaintiffs *Motion to Remand* and *Memorandum in Support*.

---

[2] It is noteworthy that the Court of Appeals did not (in fact, could not) reverse the decision to remand the case. All it held was that Lockheed had a reasonable basis for filing removal notice when it did, and that costs and fees for improvident removal were inappropriate.